UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

COALITION TO PROTECT PUGET
SOUND HABITAT, et al.,

                    Plaintiffs,

        v.

U.S. ARMY CORPS OF ENGINEERS,
et al.,

                    Defendants.

CASE NO. 2:21-CV-1685-JCC-DWC

REPORT AND RECOMMENDATION

Noting Date: July 8, 2026

Presently before the Court is Plaintiffs Coalition to Protect Puget Sound Habitat and Center for Food Safety's ("Plaintiffs") Motion for Summary Judgment, Defendants U.S. Army Corp of Engineers ("the Corps"), Scott A. Spellmon, Geoff Van Epps, and Alexander L. Bullock's ("Defendants" or "the Corps") Cross-Motion for Summary Judgment, and Intervenor-Defendants Chelsea Farms, Inc., Seattle Shellfish LLC, and Heckes Clams, Inc.'s ("Intervenors") Cross-Motion for Summary Judgment. Dkts. 107, 123, 125.[1]

The Court concludes Plaintiffs have standing to bring this action. Further, the Corps' decision to process nine permits through the letters of permission process was arbitrary and

---

[1] The District Court referred this action to United States Magistrate Judge David W. Christel. Dkt. 11.

REPORT AND RECOMMENDATION - 1

capricious. Therefore, the undersigned recommends Plaintiffs' Motion for Summary Judgment (Dkt. 107) be granted and the Corps' and Intervenors' Cross-Motions for Summary Judgment be denied. The undersigned recommends the nine LOPs be vacated.

## I.    Background

In the Fourth Amended Complaint, Plaintiffs allege the Corps violated the Rivers and Harbors Act ("RHA") and the Administrative Procedures Act ("APA") when it issued nine Letters of Permission ("LOP"). Dkt. 71. Plaintiffs contend the Corps failed to comply with the RHA and/or the APA when it authorized commercial aquaculture operations throughout Washington through the LOP permitting process. *Id*.

As alleged in the Fourth Amended Complaint and not contested by the Corps, shellfish have been harvested and grown in Washington for over 150 years. Dkt. 71, ¶ 50; Dkt. 76, ¶ 50. Plaintiffs assert cultivation has significantly expanded since the Corps issued its first Nationwide Permit ("NWP") for commercial shellfishing production in Washington in 2007. Dkt. 71, ¶ 50. NWPs "are a type of general permit issued by the [Corps'] Chief of Engineers and are designed to regulate with little, if any, delay or paperwork certain activities having minimal impacts." 33 C.F.R. § 330.1(b) (2026). "Within five years of issuance of the NWPs, the Chief of Engineers will review the NWPs and propose modification, revocation, or reissuance." 33 C.F.R. § 330.5(b)(1) (2026).

Prior to 2007, shellfish growers in Washington applied for individual permits. *See Coalition to Protect Puget Sound Habitat v. U.S. Army Corps. of Eng'rs*, 417 F. Supp. 3d 1354, 1369 (W.D. Wash. 2019) (noting shellfish growers could apply for individual permits as they did before 2007). However, in 2007, the Corps Headquarters issued the first iteration of NWP 48 "to authorize ongoing shellfish aquaculture activities throughout the United States." U.S. Army

REPORT AND RECOMMENDATION - 2

Corps of Engineers Headquarters, Decision Document Nationwide Permit 48, at 4 (Mar. 1, 2007), https://usace.contentdm.oclc.org/utils/getfile/collection/p16021coll7/id/6882. NWP 48 permitted shellfish operations in Washington beginning in 2007. Dkt. 70, ¶ 88; Dkt. 76, ¶ 88. In 2012, the Corps reissued and extended NWP 48 to cover new shellfishing operations. *See* Dkt. 70; 77 F.R. 10184-01, 2012 WL 529757 (2012). Plaintiffs alleged that, by 2015, commercial shellfish aquaculture in Washington occupied roughly 50,000 shoreline acres, equivalent to one-quarter of the state's total shoreline. Dkt. 71, ¶ 50. In 2017, the Corps reissued NWP 48. 82 FR 1860-01, 2017 WL 58009 (2017). Plaintiffs contend that, following this reissuance of NWP 48 in 2017, commercial shellfish operations expanded to cover roughly 72,000 coastal acres, equivalent to one-third of Washington's total shoreline. Dkt. 70, ¶ 50. Plaintiffs assert approximately 90% of this commercial shellfish acreage is in Willapa Bay, which—combined with Grays Harbor—is responsible for over 25% of all United States oyster aquaculture. *Id.* at ¶¶ 51-53.

On October 10, 2019, the Western District of Washington held that the Corps' 2017 reissuance of NWP 48 for commercial shellfishing operations in Washington was arbitrary and capricious. *Coalition to Protect Puget Sound Habitat*, 417 F. Supp. 3d at 1367-69. On June 11, 2020, the Court vacated the Corps' 2017 reissuance of NWP 48, *Coalition to Protect Puget Sound Habitat v. U.S. Army Corps. of Eng'rs*, 466 F. Supp. 3d 1217, 1226-27 (W.D. Wash. 2020). Plaintiffs assert that, as a result, the Corps began issuing LOPs and between February 2021 and July 2023, the Corps issued 514 LOPs to commercial shellfish operations in Washington. *See* Dkt. 71-1, Ex. A.

On December 21, 2021, Plaintiffs filed the present action. Plaintiffs initially sought an order vacating, setting aside, or remanding all LOPs for projects previously authorized under

NWP 48. Dkts. 1, 3. Later, Plaintiffs reduced the scope of their complaint to the nine LOPs at issue:

(1) Chelsea Farms (Cooper Point) (Eld Inlet) *(10.88 acres)*
(2) Seattle Shellfish LLC (Spencer Cove) (Case Inlet) *(22 acres)*
(3) Seattle Shellfish LLC (Nisqually Reach) *(6.10 acres)*
(4) Chelsea Farms (Totten Inlet) *(6.49 acres)*
(5) J & G Gunstone Clams, Inc. (Oen) (Hood Canal) *(10 acres)*
(6) Seattle Shellfish LLC (Barry) (Pickering Passage) *(5 acres)*
(7) Station House Oyster Company (Project 8) (Willapa Bay) *(292.80 acres)*
(8) Heckes Clams, Inc. (Willapa Bay) *(272.56 acres)*
(9) J & G Gunstone Clams, Inc. (Kalset Point) (Discovery Bay) *(30 acres)*

Dkt. 71-6.

On June 16, 2025, Plaintiffs filed their Motion for Summary Judgment. Dkt. 107. Defendants filed their Cross-Motion for Summary Judgment and Response on September 15, 2025. Dkt. 123. On October 13, 2025, the Intervenors filed their Cross-Motion for Summary Judgment and Response. Dkt. 125. Plaintiffs filed their Response to both Cross-Motions on December 22, 2025, and Defendants and the Intervenors filed Replies on February 3, 2026 and March 3, 2026, respectively. Dkts. 129, 130, 133. The Court heard oral argument on May 19, 2026.

## II.    Standard of Review

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. When the parties file cross-motions for summary judgment on the same claims, the Court "must consider each party's motion separately and on its own merits, 'giving the non-moving party in each instance the

REPORT AND RECOMMENDATION - 4

benefit of all reasonable inferences.'" *Friends of Animals v. Silvey*, 353 F. Supp. 3d 991, 1003 (D. Nev. 2018) (quoting *A.C.L.U. of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th Cir. 2006)). In weighing these motions, "the court must consider each party's evidence, regardless under which motion the evidence is offered." *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011).

Compliance with National Environmental Policy Act ("NEPA") and decisions under the RHA are reviewed under the Administrative Procedures Act ("APA"). 5 U.S.C. §§ 701-06; *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 960 (9th Cir. 2005); *Columbia Riverkeeper v. U.S. Army Corps of Engineers*, 706 F.Supp.3d 1127, 1136 (W.D. Wash. 2020). A court may set aside an agency action under the APA if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A). This standard is deferential, and courts should uphold an agency's decision

> unless the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 920–21 (9th Cir. 2018) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)). Therefore, when deciding the parties' motions for summary judgment, the Court "applies the legal standards governing a review conducted pursuant to § 706(2)(A) and determines whether, as a matter of law, the Agenc[y's] decision to approve and proceed with the regulation is arbitrary and capricious or violates the APA, NEPA, . . . and their implementing regulations." *Trident Seafoods Corp. v. Bryson*, 2012 WL 5993216, at *3 (W.D. Wash. Nov. 30, 2012).

REPORT AND RECOMMENDATION - 5

**III.    Discussion**

A. *Standing*

Intervenors first argue Plaintiffs lack standing to bring this lawsuit. Dkt. 125.[2] "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433,439 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734, 128 S. Ct. 2759, 171 L.Ed.2d 737 (2008)). A plaintiff seeking relief in federal court must establish the three elements that constitute the "irreducible constitutional minimum" of Article III standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The three elements are: the plaintiff "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

In order to establish an injury in fact in the context of a claimed procedural error in an agency's decision-making process, a plaintiff must show that "(1) the [agency] violated certain procedural rules; (2) these rules protect [a plaintiff's] concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests." *San Luis & Delta-Mendota Water Authority v. Haugrud*, 848 F.3d 1216, 1232 (9th Cir. 2017) (alterations in original) (quoting *Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 949 (9th Cir. 2006)). To establish causation and redressability, the plaintiff must show that "the relief requested—that the agency follow the correct procedures—may influence the agency's ultimate decision." *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1156 (9th Cir. 2015) (quoting *Salmon Spawning & Recovery All. v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008)).

---

[2] The Corps does not challenge standing. *See* Dkts. 123, 130.

REPORT AND RECOMMENDATION - 6

When there is an organizational plaintiff, such as in this case, the organizational plaintiff must demonstrate that at least one of its "members would otherwise have standing to sue in [the member's] own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1139 (9th Cir. 2013) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). A "generalized harm to ... the environment will not alone support standing[.]" *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). Plaintiffs must instead demonstrate imminent individualized harm to their recreational or aesthetic use of an area. *Sierra Club v. Morton*, 405 U.S. 727, 734–36 (1972). The Ninth Circuit considers a plaintiff to have shown imminent injury resulting from an agency's programmatic action if the plaintiff identifies a concrete interest that is affected by the agency action, even if the potential injury is merely threatened and is contingent on additional actions. *Idaho Conservation League v. Mumma*, 956 F.2d 1508, 1515–16 (9th Cir. 1992).

In this case, Plaintiffs raise nine claims asserting procedural violations of the RHA under the APA. Dkt. 71. As each claim is related to a different LOP, the Court will determine if Plaintiffs have sufficiently shown standing for each claim.

First, Plaintiffs must show injury in fact. Plaintiffs have submitted evidence from members of both Center for Food Safety ("CFS") and Coalition to Protect Puget Sound Habitat. Dkts. 108-115. The evidence shows LOPs 1-9 have impaired individual members' ability to enjoy the aesthetics and recreational activities in the areas of all nine LOPs at issue. Dkt. 108, Barkhurst Dec. (LOPs 7, 8); Dkt. 108, Buchele Dec. (LOPs 7, 8); Dkt. 110, Douglas Dec. (LOPs 4, 6); Dkt. 111, Garner Dec. (LOPs 2, 3, 4, 6); Dkt. 112, Hendricks Dec. (LOP 1); Dkt. 113,

REPORT AND RECOMMENDATION - 7

Kirkland Dec. (LOPs 2, 3); Dkt. 114, Santiago Dec. (LOP 9); Dkt. 115, Wold Dec. (LOP 5). Plaintiffs also allege the Corps failed to follow proper permitting procedures and issued LOPs rather than a full individual permit review for the commercial shellfish operation at issue in each of the nine LOPs. *See e.g.* Dkt. 71 at ¶¶ 148-50. Plaintiffs contend the Corps has improperly issued LOPs without completing a NEPA analysis for the commercial shellfishing projects and the unlawful issuance of the LOPs is harming Plaintiffs' aesthetic, recreational, personal, and property interests. *See id*. at ¶¶ 7-8, 12, 122. Thus, Plaintiffs have alleged an injury in fact. *See Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 100 F.4th 1349, 1355 (11th Cir. 2024) (finding a concrete interest from an aesthetic injury from viewing a dock).

Second, Plaintiffs must show causation. While the evidence related to causation is more generalized, when a plaintiff is asserting a violation of a procedural right conferred by a federal statue the standard is softened because "the causation and redressability requirements [for standing] are relaxed." *WildEarth Guardians*, 795 F.3d at 1154 (citation omitted). Plaintiffs provided evidence of individualized harms to both the aesthetic and recreational use of each area wherein each challenged LOP is located. *See* Dkts. 108-115. For example, Plaintiffs submitted declarations that individual members have lost enjoyment in their ability to observe wildlife and recreate. Members have also stated they have seen wildlife, such as seals, trapped in the plastic netting used in the commercial shellfish aquacultures. The Court finds this is sufficient to show causation.

Finally, Plaintiffs have sufficiently shown redressability. The alleged procedural injury is the Corps' failure to comply with the RHA. The Court can remand this matter to the Corps for new proceedings under the RHA or vacate the LOPs through a court order. These options would redress Plaintiffs' procedural injury.

REPORT AND RECOMMENDATION - 8

For these reasons, the Court finds Plaintiffs have sufficiently shown they have standing to pursue each claim in this action.

B. *Issuance of LOPs*

i. Legal Standard

The Corps issues permits under several statutory authorities, including Section 10 of the RHA (33 U.S.C. § 403). Section 10 of the RHA prohibits excavating, filling, or any alteration or modification to "the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor or refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States" without the authorization of the Corps through the issuance of a permit. 33 U.S.C. § 403. The Corps is a "highly decentralized organization" that delegates most of the authority for administering its regulatory programs to engineers at the regional division and local district level. *See* 33 C.F.R. §§ 320.1(a)(2), 325.8(b)–(c). "Reducing unnecessary paperwork and delays is a continuing Corps goal." *Id.* § 320.1(a)(4).

The Corps regulations provide that "[t]he decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." *Id.* § 320.4(a)(1). The public interest review process also addresses mitigation measures needed to avoid, minimize, rectify, reduce, or compensate for resource losses resulting from authorized projects. *Id.* § 320.4(r).

Once it has been determined an activity requires a permit from the Corps under the RHA, the Corps must comply with several other federal statutes, including NEPA. *Pres. Soc. of Charleston v. U.S. Army Corps of Eng'rs*, 2013 WL 6488282, at *2 (D.S.C. Sept. 18, 2013). NEPA requires that all "major federal actions significantly affecting the quality of the human environment" must undergo a review process that culminates in a "detailed statement" of the

REPORT AND RECOMMENDATION - 9

environmental impact of the proposed action, any adverse effects, and alternatives to the proposed action. 42 U.S.C. § 4332(C). "A decision on a permit application will require either an environmental assessment or an environmental impact statement unless it is included within a categorical exclusion." 33 C.F.R. § 325.2(a)(4).

A categorical exclusion is "a category of actions which do not individually or cumulatively have a significant effect on the human environment," 40 C.F.R. § 1508.4, and are either specifically listed under 33 C.F.R. pt. 325, app. B., para. 6, or can be authorized by an LOP. 33 C.F.R. pt. 325, app. B., para. 6(5). The Corps has stated:

> The following activities normally do not significantly affect the quality of the human environment t (sic) and are therefore categorically excluded from NEPA documentation:
> (1) For permit applications for Clean Water Act, Section 404, River and Harbors Act of 1899, Section 10, and Marine Protection, Research, and Sanctuaries Act of 1972, section 103:
> (i) Fixed or floating small private piers, small docks, boat hoists and boathouses.
> (ii) Minor utility distribution and collection lines including irrigation;
> (iii) Minor maintenance dredging using existing disposal sites;
> (iv) Boat launching ramps;
> (v) All applications which qualify as letters of permission (as described at 33 CFR 325.5(b)(2)).

33 C.F.R. § 333.14(g).

"Letters of permission are a type of permit issued through an abbreviated processing procedure which includes coordination with Federal and state fish and wildlife agencies, as required by the Fish and Wildlife Coordination Act, and a public interest evaluation, but without the publishing of an individual public notice." 33 C.F.R. § 325.2(e)(1). An LOP may be used in cases subject to section 10 of the RHA "when, in the opinion of the district engineer, the proposed work would be minor, would not have significant individual or cumulative impacts on environmental values, and should encounter no appreciable opposition." *Id*. at § 325.2(e)(1)(i).

REPORT AND RECOMMENDATION - 10

ii. Analysis

First, for an LOP to be issued under the RHA, the district engineer must find the proposed work would be minor. 33 C.F.R. § 325.2(e)(1)(i) (2026). The parties have not cited, nor has the Court found, a definition for the term "minor" in the Corps' regulations. The Corps references the "common understanding of the term minor," Dkt. 123 at 16, and general usage of the word "minor" means "inferior in importance, size, or degree." *Minor*, MERRIAM-WEBSTER'S DICTIONARY, https://www.merriam-webster.com/dictionary/minor (last visited June 4, 2026).

In considering "minor" in the context of an LOP, one court noted that the Corps' categorical exclusions list at 33 C.F.R. § 333.14(g) shares a theme: "each exclusion involves projects with negligible effects on 'the quality of the human environment'." *Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 2025 WL 2954093, at *4 (11th Cir. Oct. 20, 2025). A second court found,

> The activities of the first four exclusions are individual and non-intrusive. The repetitive use of the words "small and minor" indicates the limited impact expected by the activity allowing for categorical exclusion. Obviously, the Corps drafters intended the categorical exclusions, including the "letter of permission," to cover the same types of non-intrusive projects[.]

*Arkansas Nature All., Inc. v. U.S. Army Corps of Eng'rs*, 266 F. Supp. 2d 876, 885 (E.D. Ark. 2003). In *Center for a Sustainable Coast*, which the Court finds instructive on this issue, the court determined a proposed work was minor based on the (1) size; (2) scale; and (3) other attributes/character. 2025 WL 2954093 at *2.

SIZE: First, the Court will consider the size of the proposed projects identified in the LOPs. The size of the smallest shellfishing operation in this case—Seattle Shellfish LLC's Barry Lease—is 5 acres, which is approximately 100 times larger than the dock deemed "minor" in *Center for a Sustainable Coast*. 2025 WL 2954093 at *2; AR6-0038 (LOP 6) (1 acre is

REPORT AND RECOMMENDATION - 11

approximately 43,560 square feet). The size of the largest shellfishing operation in this case—Station House Oyster Company's Willapa Bay Lease—is 292.8 acres, which is approximately 6,120 times larger than the dock in *Center for a Sustainable Coast. See Ctr. for a Sustainable Coast*, 2025 WL 2954093, at *2; AR7-0030 (LOP 7). All nine shellfishing operations in this case are much larger than the bridge in *Arkansas Nature Alliance* that was not "minor." *See Arkansas Nature Alliance*, 266 F. Supp. 2d at 881-82.[3] Moreover, each project is for cultivating large numbers of shellfish for human consumption – commercial shellfishing – not small, personal-use projects. Simply put, the nine LOPs are not small projects; rather, the projects are commercial shellfishing operations located on hundreds of acres of intertidal habitats in the navigable waterways.

SCALE: The Corps argues the proposed projects are very small percentages of the overall navigable waterways. *See* Dkt. 123. Thus, the Corps essentially argues the scale of these nine LOPs makes each project minor. Most, if not all, of the shellfishing operations in this case take place in shallow, intertidal waters. *See* AR1-0024, AR2-0041, AR3 -0036, AR4-0042, AR5-0023, AR6-0037, AR6-0044, AR7-0029, AR8-0063, AR9-0031. While the Court is examining only nine LOPs, the Court will not view the Corps' decision in a vacuum. Though the individual projects detailed in each LOP do not comprise an excessive amount of land in each respective intertidal habitat, the nine LOPs viewed in context with the overall shellfishing operations in Washington present a much larger impact. For example, the Corps previously authorized aquaculture operations in nearly 50% of the intertidal habitat of Willapa Bay. *See* AR7-0046. Thus, even though Station House Oyster Company's Willapa Bay Lease (LOP 7) and Heckes

---

[3] The Court recognizes intertidal habitats are different from bridges and docks; however, when considering size the Court looks to other courts' findings of projects that were or were not deemed "minor."

REPORT AND RECOMMENDATION - 12

Clams' Willapa Bay Lease (LOP 8) combine to only cover approximately 1% of the intertidal habitat in Willapa Bay, the scale of these projects is not "minor" when considering the shellfishing operations in Willapa Bay as a whole. *See id.* (Station House comprising 0.5% of Willapa Bay's intertidal habitat); AR8-0072 (Heckes comprising 0.5% of Willapa Bay's intertidal habitat). And, after the Court vacated NWP 48, the Corps issued at least 500 LOPs for activities associated with commercial shellfish aquaculture in Washington between January 2021 and January 2023. *See* Dkt. 71-1, ¶ 123; Dkt. 71-2; Dkt. 79, ¶ 123.

As with size, each project is for cultivating large numbers of shellfish for commercial use, not small-scale shellfish farming. While the Corps states it considered the individual and cumulative impacts, the language in the memorandum of decisions is repetitive among all nine LOPs and the Court cannot conclude the Corps adequately considered the cumulative impacts of commercial shellfishing operations when determining the shellfish operations in navigable waters in Washington are "minor." *See Coal. to Protect Puget Sound Habitat*, 417 F. Supp. 3d at 1364 ("[t]he Corps must analyze the individual and cumulative impacts of the proposed activity against the environmental baseline").

Moreover, while it is not clear that navigability would be or has been severely impacted by the projects, the Corps admits there are legitimate concerns about the impact of these projects. For example, the Corps noted there are legitimate concerns about the impacts of plastics on our environment, "particularly on the aquatic environment and within the food chain." *See* AR6-0063, AR2-0054, AR3-0047, AR7-0048, AR7-0053. The Corps also noted "[t]he nets and tubes may make it harder for wading birds to forage in the intertidal area and will create habitat less suitable for flatfish and salmon." AR2-0056, AR3-0049, AR500041. As these are commercial shellfish operations covering hundreds of acres of intertidal habitat, there would be a measurable

adverse impact on navigability, aesthetics, and environment due to the presence of tubes, nets, and other manmade materials introduced into the waterways by the permitted shellfish operations. *See* AR8-0081, AR5-0046, AR6-0060. The Corps made these findings as to each LOP and referenced the cumulative impact, but, based on the record, the Corps ignored the true cumulative impacts of the more-than-500 LOP permitted commercial shellfish operations issued throughout a two-year period.

Ignoring the totality of the LOPs issued for shellfishing operations around Washington is akin to "death by a thousand cuts." *Sierra Forest Legacy v. Sherman*, 646 F.3d 1161, 1196 (9th Cir. 2011) (Fisher, J., dissenting) ("we must consider environmental degradation in . . . a cumulative context in order to preclude a death by a thousand cuts"). The Corps' finding that the nine LOP projects were "minor" runs counter to the evidence before the Corps and is implausible in light of the scale of the commercial shellfish operations approved by the Corps within each LOP and in Washington.

**OTHER ATTRIBUTES:** Considering other attributes of the nine LOPs, the Court concludes additional factors show the proposed projects are not "minor" and, thus, the Corps' decision to issues permits through the LOP process was arbitrary and capricious. First, the purpose of the proposed work is not minor. For example, several of the LOPs at issue authorize the cultivation of geoduck clams, which involves high density PVC tubes that are four inches in diameter and nine inches in length for seeding. *See* AR8-0059. The PVC tubes are pushed six inches (2/3 of the way) into the substrate at low tide at an approximate density of one tube per square foot. *Id*. PVC tubes and netting covering the tubes would remain on site for two years and be reinserted approximately 5-6 years later. *See id*. Based on this information, the LOP for Heckes Clams' Willapa Bay (LOP 8) would, alone, authorize the use of approximately 1.8 million PVC tubes

REPORT AND RECOMMENDATION - 14

(43,560 sq ft per acre x 41.87 acres of geoduck clams) for *one* cultivation cycle of geoduck clams. *See id*. This is also only one portion of the land and shellfish being cultivated under LOP 8. *See* AR8-0057—AR8-0061.

While NWP 48 only authorized widespread shellfishing operations to function for five years before renewal, the LOPs authorized the operations to function for fifteen years before renewal. *See e.g.* AR8-0060 (seeking authorization for 15 years). This allows for several cycles of shellfish cultivation, which requires PVC tubes, nets, plastics and other manmade materials to be placed into the intertidal habitats continuously for fifteen years. LOP 8 could, alone, result in approximately 3.6 million PVC tubes (1.8 million tubes x 2 geoduck cultivation cycles) being placed in the substrate over the 15-year period. *See* AR8-0059-60. Furthermore, because commercial shellfishing operations introduce extensive manmade materials onto hundreds of acres of intertidal habitats during 15-year periods, the projects permitted by the nine LOPs change the purpose of the intertidal habitats. *See Arkansas Nature Alliance, Inc. v. U.S. Army Corps of Eng'rs*, 266 F. Supp. 2d 876, 886 (E.D. Ark. 2003) (finding bridge that doubled in size and changed the purpose of the bridge to be not minor); *Ctr. for a Sustainable Coast v. U.S. Army Corps of Eng'rs*, 2025 WL 2954093, at *2 (11th Cir. Oct. 20, 2025) (finding building a dock used for small, private boats was minor).

The Corps and Intervenors argue that the proposed projects are minor because the Corps found the proposed projects in each of the nine LOPs did not alter the shellfishing activities that were already being conducted on the aquacultures. Dkts. 123, 125; *see also* AR6-0060; AR8-0061; AR7-0052 ("proposed work is simply a continuation of previously authorized work"); AR9-0024 – AR9-0073 (referencing several times that because the project is a continuation of existing shellfish operations any impact is negligible); AR5-0060 (same); AR3-0062 (same);

REPORT AND RECOMMENDATION - 15

AR6-0073 (same). The parties do not dispute that the aquacultures identified in the nine LOPs were included in NWP 48. The shellfishing operations that existed prior to the issuance of the nine LOPs were unauthorized because the Corps' issuance of NWP 48 in 2017 was arbitrary and capricious. *Coalition to Protect Puget Sound Habitat v. U.S. Army Corps of Eng'rs*, 466 F. Supp. 3d 1217, 1219 (W.D. Wash. 2020), *aff'd* 843 Fed. App'x 77 (9th Cir. 2021). The nine LOPs in this case authorized projects that were largely carried over from the vacated 2017 issuance of NWP 48. At bottom, using the unauthorized activities as a baseline to determine "ongoing" activities would be minor is unreasonable, arbitrary and capricious.

Further, in light of Judge Lasnik's decision, the Corps' and Intervenors' reliance on the state of the aquacultures at the time each LOP was requested is disingenuous. The Court previously stated,

> Noting that a particular environmental resource is degraded is not an excuse or justification for further degradation. The Corps must analyze the individual and cumulative impacts of the proposed activity against the environmental baseline, not as a percentage of the decades or centuries of degrading activities that came before.

*Coal. to Protect Puget Sound Habitat*, 417 F. Supp. 3d at 1364. Accordingly, the Corps cannot rely on past improper shellfishing permits and the past decades of shellfishing activities to establish the project size, scope, and environmental baseline. Nor can the Corps use this degraded baseline as justification for finding the proposed aquaculture projects would be minor because they are merely a continuation of improperly authorized aquaculture activity.

Moreover, the Court previously found evidence suggested the environmental impacts from the shellfishing activities authorized under NWP 48 "were more than minimal, both individually and cumulatively." *Id*. at 1224. The Corps' decision to classify the aquaculture projects identified in each LOP as "minor" is inconsistent with the Court's previous conclusion that the proposed projects, individually, appeared to have more than a minimal environmental

REPORT AND RECOMMENDATION - 16

impacts from the shellfishing activities.[4] Accordingly, the character and purpose of these operations cannot be reasonably construed as "minor."

**BOILERPLATE DECISION:** The Court also finds the Corps has not adequately articulated its reasoning for finding each LOP aquaculture project would be minor. The Corps' nine memorandum of decisions provide essentially the same language for the majority of its findings, including finding each LOP project would be minor. Agencies must provide a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotations omitted). Under this rational connection analysis, "[s]tating a factor was considered . . . is not a substitute for considering it." *Getty v. Fed Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). Boilerplate explanations typically do not satisfy the rational connection analysis. *See, e.g.*, *Washington v. U.S. Dep't of Educ.*, 167 F.4th 1241, 1246-47 (9th Cir. 2026) (noting an agency's action is arbitrary and capricious when it is unclear or not understandable and finding that boilerplate discontinuation notices were not sufficiently reasoned); *Nw. Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 689-90 (9th Cir. 2007) (finding that an agency acted arbitrarily and capriciously by sending "similar letter[s]" "baldly asserting" conclusory statements); *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1405 (D.C. Cir. 1995) (finding that boilerplate letters "omitted the critical step—connecting the facts to the conclusion"); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1352 (D.C. Cir. 2014) (finding that "programmatic boilerplate" is not a "reasoned explanation").

---

[4] The Court was analyzing a nationwide permit and not an LOP in *Coal. to Protect Puget Sound Habitat*, 417 F. Supp. 3d 1354. However, the matter before this Court is whether the Corps could exclude the shellfish operations from NEPA requirements by determining these commercial shellfish operations qualify under a categorical exclusion.

REPORT AND RECOMMENDATION - 17

In this case, the Corps used nearly identical language in Section 8.1 – finding the proposed projects would be minor – in eight of the nine LOP memorandum decisions. In doing so, the Corps heavily relied on conclusory reasoning and did not provide an adequate explanation to prove why each project was "minor." As with the issuance of NWP 48, the Corps again relied on "conclusory findings of minimal individual and cumulative impacts [that were] not supported by substantial evidence in the record." *Coalition to Protect Puget Sound Habitat*, 417 F. Supp. 3d at 1367. In the Memorandum of Decision for LOP 2, the Corps provided a more thorough analysis about why the project would be "minor." *See* AR2-0069-70. However, this operation cannot be reasonably construed as "minor" due to its size, scale, and scope. This shellfish operation is 22 acres and the project consists of cultivating and harvesting geoduck clams, non-geoduck clams, and oysters for human consumption. AR2-0041-42. This operation comprises 1.56% of the intertidal habitat in Case Inlet, where existing aquaculture operations already impact 17.3% of the intertidal habitat. AR2-0056. Thus, this project is not "minor."

The Corps' decision to use boilerplate reasoning extends throughout all the memorandum of decisions. For example, the Corps used nearly identical language when it stated it provided notification to tribes regarding the existing projects that were seeking reauthorization under a LOP, "with no changes from the previous NWP 48 verifications" and they would not be sending out notifications. *See e.g.* AR7-0068; AR1-0048; AR2-0067; AR6-0077; AR3-0059. The Corps also used nearly identical language in several memorandum of decisions when determining impacts would be negligible because the proposed projects were merely continuations of pervious shellfish activities. AR6-0060; AR8-0061; AR7-0052 ("proposed work is simply a continuation of previously authorized work"); AR9-0024 – AR9-0073 (referencing several times that because the project is a continuation of existing shellfish operations any impact is

REPORT AND RECOMMENDATION - 18

negligible); AR5-0060 (same); AR3-0062 (same); AR6-0073 (same); AR4-0060 (same); AR1-0051 (same); AR2-071 (same). This use of the same or nearly identical language in the memorandums of decision is even more concerning considering the nine LOPs were prepared by eight different people. *See* AR1-0053 (prepared by Karvounis, reviewed and approved by Hafer); AR2-0073 (prepared by Garner, reviewed by Clinton, approved by Larsen); AR3-0065 (prepared by Wolf, reviewed by Lee, approved by Larsen); AR4-0068 (prepared by Biljan, reviewed by Bennett, approved by Larsen); AR5-0063 (prepared by Payne, reviewed by Guy, approved by Davis); AR6-0084 (prepared by Smith, reviewed and approved by Payne); AR7-0075 (prepared by Sullivan, reviewed and approved by Dailey); AR8-00105-06 (prepared by Smith, reviewed and approved by Payne); AR9-0073 (prepared by Schroeder, reviewed and approved by Payne).

The Corps' decision to provide vague, conclusory, repetitive reasoning for finding each proposed project would be "minor" removed this Court's ability to determine if the Corps' decision was reasonable. Further, the Corps' decision to use the same language in all nine LOPs undermines the Corps' findings and this Court's ability to assess whether there is a rational connection between the evidence and the Corps' decision for each LOP. Without adequate, reasoned explanations, the Corps' decision fails under the APA.

Finally, the categorical exclusions in the Corps' own regulations support this Court's conclusion that the nine proposed projects would not be "minor." The categorical exclusions include one-time, non-recurring building projects (i.e. docks, small private piers, boat ramps), allow for minor maintenance, or minor disruptions to the navigable waterways. *See* 33 C.F.R. § 333.14(g). While the Court understands LOPs are in addition to this list, the Court finds the identified categorical exclusions are instructive to show the types of activities that "normally do not significantly affect the quality of the human environment and are therefore categorically

REPORT AND RECOMMENDATION - 19

excluded from NEPA." 33 C.F.R. § 333.14(g) (cleaned up). Unlike the other projects identified as categorical exclusions, the LOPs in this case have been approved for fifteen years of continuous, on-going activities, not one-time events. The activities involve acres of land, ranging from 5 acres to nearly 300 acres, not small disruptions for minor maintenance, minor dredging, or a small dock, ramp, or boathouse. For instance, one project alone could result in over three million PVC tubes being placed in the substrate over the fifteen-year period – not including netting, plastics and other materials on that one site. Finally, the projects at issue in this case are for harvesting commercial shellfish for human consumption, not small, personal use projects. Thus, the Court finds the Corps' other categorical exclusions are instructive and show the activities in the nine LOPs at issue in this case are not "minor" activities that will not significantly affect the quality of the human environment. The Corps' decision to find the projects met the categorical exclusion through the LOP process and could be excluded from NEPA process was arbitrary and capricious.

In sum, the record fails to support the Corps' determination that the aquaculture projects in question are "minor" under the LOP permitting process. Even if the aquaculture projects could have been deemed "minor," the Corps failed to adequately explain its finding and reasoning for that finding. Therefore, the Corps' decision to issue permits under the LOP permitting process because the nine proposed projects would be "minor" was arbitrary and capricious in violation of the APA.

As the Corps' decision finding the projects would be minor was arbitrary and capricious, the Court declines to consider the remaining two factors that allow permitting under the LOP process. The Court recommends Plaintiffs' Motion for Summary Judgment be granted and the Corps' and the Intervenors' Cross-Motions for Summary Judgment be denied.

REPORT AND RECOMMENDATION - 20

C. *Remedy*

Plaintiffs seek vacatur of the nine LOPs. Plaintiffs are correct that vacatur is the presumptive remedy under the APA, *Alliance for the Wild Rockies v. United States Forest Service*, 907 F.3d 1105, 1121–22 (9th Cir. 2018), and "[w]e order remand without vacatur only in 'limited circumstances,'" *Pollinator Stewardship Council v. U.S. Environmental Protection Agency*, 806 F.3d 520, 532 (9th Cir. 2015) (quoting *Cal. Cmties. Against Toxics v. EPA*, 688 F.3d 989, 994 (9th Cir. 2012)). "Whether agency action should be vacated depends on how serious the agency's errors are and the disruptive consequences of an interim change that may itself be changed." *Nat'l Family Farm Coal. v. E.P.A.*, 966 F.3d 893, 929 (9th Cir. 2020) (quoting *Cal. Cmties.*, 688 F.3d at 992). "In the context of environmental regulation, the Ninth Circuit considers (a) whether vacating the invalid rule would risk environmental harm and (b) whether the agency could legitimately adopt the same rule on remand (or whether the flaws were so fundamental that it is unlikely the same rule would result after further analysis)." *Coal. to Protect Puget Sound Habitat*, 466 F. Supp. 3d at 1220. Courts "leave an invalid rule in place only when equity demands that we do so." *Pollinator Stewardship Council*, 806 F.3d at 532.

First, the Court must analyze the seriousness of the Corps' errors. This is the second time the Court has found the Corps' decision-making process regarding commercial shellfish operations in Washington State arbitrary and capricious. The Court has already determined the Corps erred in issuing NWP 48 and failed to appropriately consider the environmental impacts of commercial shellfishing activities. And, it appears the programmatics and other documents relied on by the Corps in this case were referenced by Judge Lasnik and used by the Corps to support the Corps' previously-vacated decisions. *See Coal. to Protect Puget Sound Habitat*, 466 F. Supp. 3d at 1220-23. Based on the Corps' permitting history in Washington related to commercial

REPORT AND RECOMMENDATION - 21

shellfish operations, the Court is concerned by the Corps' recurring arbitrary and capricious actions when issuing permits for commercial shellfish aquaculture operations in Washington. Further, as the Court finds the Corps erred in finding the nine proposed projects would be minor, the Court finds it unlikely the Corps could legitimately reissue LOPs on remand. Overall, the record supports finding the first factor – the seriousness of the agency's errors – weighs in favor of vacatur of the nine LOPs.

Second, the Court must consider the disruptive consequences of an interim change that may itself be changed. The Court finds Judge Lasnik's previous decision instructive:

> The equities in this case pit acknowledged adverse environmental impacts, the full extent of which have not been fully evaluated or quantified by the agency tasked with doing so, against the devastating impacts that will result if all commercial shellfishing activities in the State of Washington are immediately prohibited while the Corps processes a replacement permit.

*Coal. to Protect Puget Sound Habitat*, 466 F. Supp. 3d at 1226. The Court recognizes the value of commercial shellfish operations as identified by the Intervenors. *See* Dkts. 125, 133. However, the parties have not shown the inequities to the commercial shellfish companies outweigh the impacts of allowing commercial shellfish activities to occur without proper permitting and proper consideration of the environmental impacts. Therefore, despite the impacts to commercial shellfish activities and these nine commercial shellfish operations, the Court finds vacatur of the nine LOPs is necessary.

## IV.    Conclusion

The Court concludes Plaintiffs have standing to bring this action. Further, the Corps' decision to process nine permits through the LOP process was arbitrary and capricious. Therefore, the undersigned recommends Plaintiffs' Motion for Summary Judgment (Dkt. 107) be

REPORT AND RECOMMENDATION - 22

granted and the Corps' and Intervenors' Cross-Motions for Summary Judgment (Dkts. 123, 125) be denied. Additionally, the undersigned recommends:

1) The nine LOPs in this action be VACATED. The vacatur be STAYED for sixty days to allow the Corps and/or Intervenors to appeal and obtain a stay from the Ninth Circuit;

2) The vacatur be STAYED as to the following activities:

a) maintenance and harvesting activities for shellfish that were already planted/seeded as of the date of any order adopting this Report and Recommendation;

b) seeding/planting activities occurring within six months of the date of any order adopting this Report and Recommendation, as well as maintenance and subsequent harvesting of the beds seeded/planted under this subsection;

**The stay provided by this section (paragraph 2) is contingent on compliance with paragraph 3, below;**

3) Permittees who intend to conduct maintenance, harvest, and/or seeding/planting activities under the preceding paragraph shall submit an application for an individual Corps permit as soon as practicable and no later than six months from the date of any order adopting this Report and Recommendation; and

4) The Corps shall process shellfish cultivation permits in Washington in a manner consistent with the RHA and NEPA requirements.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit not later than **fourteen (14) days** from the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar **fourteen (14) days** from the date they are filed. Responses to objections may

REPORT AND RECOMMENDATION - 23

be filed by **the day before the noting date**. If no timely objections are filed, the matter will be ready for consideration by the District Judge on **July 8, 2026.**

Dated this 23rd day of June, 2026.

_David W. Christel_
David W. Christel
United States Magistrate Judge

REPORT AND RECOMMENDATION - 24